**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| ANDREW MAIN, NATALIE MAIN, and A.M., a minor child by Parents and Next Friends Andrew Main and Natalie Main, | Case No. 26-cv-11455 |
| Plaintiffs, | Hon. |
| v. | |
| THE CHARTER TOWNSHIP OF WEST BLOOMFIELD, a political subdivision of the State of Michigan, | |
| Defendant. | |

## COMPLAINT

Plaintiffs A.M., Natalie Main ("Natalie"), and Andrew Main ("Andrew" and, together with Natalie, the "Mains"), through their counsel, for their Complaint against Defendant Charter Township of West Bloomfield ("Township"), state as follows:

## PARTIES, JURISDICTION, AND VENUE

1. This action is brought by Natalie and Andrew in their individual capacities and as next friends for their minor son A.M.

2. Plaintiff A.M. is a minor and a Michigan resident residing in Oakland County, Michigan.

1

3.      Plaintiffs Natalie Main and Andrew Main are individuals who reside in Oakland County, Michigan, and own real property located at 4733 Hardwoods Drive, West Bloomfield, Michigan, 48323 (the "Property").

4.      Natalie and Andrew are the primary caregivers of A.M.

5.      Defendant Charter Township of West Bloomfield is a political subdivision of the state of Michigan, physically located in Oakland County, Michigan, and subject to the jurisdiction of this Court.

6.      The events giving rise to this action took place in West Bloomfield Township, Michigan, and this matter involves real property located in West Bloomfield Township, Michigan.

7.      This case arises out of the Township's violations of the Mains' federal constitutional rights as secured by the Fourteenth Amendment Due Process Clause and, consequently, the Mains have a viable claim for damages under 42 U.S.C. §§ 1983 and 1988, as well as claims pursuant to Michigan state law and claims (on the Mains' own behalf and on behalf of A.M.) pursuant to 42 U.S.C. § 3601 *et seq*.

8.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights jurisdiction), because this Complaint states claims arising under the laws of the United States, and seeks to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

9. This Court has supplemental jurisdiction over the Mains' state law claim under 28 U.S.C. § 1367 (supplemental jurisdiction), because the state law claim is so related to the federal claims that they are part of the same case or controversy.

10. This Court has authority to issue declaratory relief pursuant to 22 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57.

11. This Court has authority to issue injunctive relief pursuant to Fed. R. Civ. P. 65.

12. Venue is proper in this Court under 28 U.S.C. § 1391(b), because the Township is located in this District, the events giving rise to the claims in this matter occurred in this District, and a substantial part of property that is the subject of this action is situated in this District.

## FACTUAL BACKGROUND

### *The Mains Purchase the Property and Seek to Install a Fence to Assist A.M.*

13. Plaintiffs incorporate in full herein the preceding paragraphs of this Complaint.

14. This matter arises out of what is, ordinarily, a simple process for any homeowner upgrading their outdoor space – a fence permit.

15. A.M. has been diagnosed with Attention-Deficit/Hyperactivity Disorder ("ADHD"), Generalized Anxiety Disorder, Impulse Control Disorder, and Autism level 2, and is therefore handicapped within the meaning of the Fair Housing Act.

16. A.M.'s disabilities substantially limit his ability to engage in major life activities, including but not limited to communicating, learning, self-care, and emotional regulation.

17. A.M.'s doctors have determined that being able to run and play outside freely would benefit A.M. and help manage the symptoms of his disability.

18. However, A.M. has a history of attempting to run away from the Mains' property, and is unable to understand the risks associated with doing so and appropriately regulate his behavior.

19. Conditions present on and around the Property mean that A.M. would be at risk of serious physical harm if he were to run away, including but not limited to large dogs tethered on neighboring properties, water hazards, wild animals like turkeys and coyotes, and vehicle traffic.

20. It is therefore dangerous for A.M. to play outside in an unfenced area, supervised or otherwise.

21. Because of the dangers associated with A.M. attempting to run away when playing outside, the Mains have been advised by one of A.M.'s treating physicians that installing a fence in their backyard is necessary for A.M. to be able to play outside and manage his symptoms.

22. Therefore, when the Mains began looking to purchase a home in West Bloomfield Charter Township in February 2024, they knew that, due to A.M.'s

4

disabilities, it would be necessary to be able to purchase a home that either already had a fenced-in backyard, or a home where a fenced-in backyard could be installed.

23.    Prior to purchasing the Property, the Mains reviewed the appraisal for the Property and seller disclosures, which did not identify any restrictions on the Property that might affect the ability to construct a fence.

24.    The Mains also researched the available plat maps and spoke with a clerk at the Township, who confirmed that they would be able to build a fence on the Property because there were no restrictions identified.

25.    The Mains further reviewed Township ordinances to determine whether there would be any limitations on their ability to install a fence, and did not identify any restrictions.

26.    The Mains also spoke with the Homeowners' Association for the Property, and sent an inquiry to the then-current homeowner, who confirmed they were unaware of any restrictions related to fencing.

27.    The Mains also knew the prior owners of the Property had an above-ground pool and shed, and had replaced the driveway in 2015 without issue.

28.    As such, when the Mains decided to purchase the Property, they did so because of their well-founded belief that a fence was permissible, and that they would be able to acquire any necessary permits without undue delay.

29.    The Mains closed on the purchase of the Property on June 7, 2024.

30.     The Property is located in the subdivision named "The Birches Sub. No. 3," which received its final approval on April 9, 1969.

31.     The Property is zoned as R-15, One Family Residential, and includes a single-family home, which was built in 1975.

32.     The Property also includes a backyard which, on information and belief, was developed at the time the home was built and no later than 1980, and that has been used and maintained as a backyard since that time.

33.      Based on the advice and recommendation of A.M.'s treating medical provider, and to assist A.M. with his specific needs and disabilities, one of the first tasks the Mains undertook after closing was to begin working with a fencing company to build a fence on their property, to make the backyard a safe place for A.M. to play.

34.     On June 19, 2024, the Mains entered into a contract with Shelby Fencing to build a fence on the property.

35.     Upon information and belief, on June 30, 2024, Shelby Fencing submitted a fence permit application to the Township on the Mains' behalf.

36.     On July 24 and 25, 2024, anticipating the fence permit would be approved in the near future, the Mains had a landscaping company remove invasive buckthorn, tree of heaven, and dead trees from portions of the Property.

37. At that time, the landscaping company also added 25 cubic yards of a sandy mix of soil to fill in low areas in the backyard, and spread straw on top of the added soil as a mulch to prevent erosion.

38. On August 7, 2024, John Roda ("Mr. Roda"), the Township Environmental Manager at all relevant times, sent an email to Shelby Fencing, stating that the Property contained "regulated woodland and possible wetland including the 25-environmental features setback to wetland," and that any fence that would be built in those areas "would require approved environmental permitting with proper site plan development," along with a hearing at a public meeting.

39. After learning of the email from Mr. Roda, Natalie called the Township and spoke with Mr. Roda via a phone call.

40. During that call, Natalie explained to Mr. Roda that A.M. was disabled, the effect of A.M.'s disabilities, and that the Mains sought to install a fence so that A.M. could play in the backyard safely.

41. Mr. Roda discussed the general requirements for the permits he claimed were necessary, and informed Natalie that the fence was "never going to happen."

42. Natalie then contacted the Township Board of Supervisors to gather additional information on the reason for the denial, and what would be required to obtain the permits.

43. Natalie also contacted the Michigan Department of Environment, Great Lakes, and Energy ("EGLE") to obtain information related to the possible wetland area.

44. EGLE informed Natalie that there were no EGLE-regulated wetlands on the Property, and provided information related to EGLE's wetland identification program.

45. On August 13, 2024, the Township's legal counsel emailed a response to Natalie, stating that the fence permit application was under review and that the Township would reach out with the determination and "next steps."

46. The email from the Township's legal counsel was also sent to Steve Kaplan, the West Bloomfield Township Supervisor at the time, and Amy Neary, the Township's Director of Planning and Development Services.

47. Natalie then contacted the Township again, and specifically requested information on whether it was possible to appeal what she understood to be a denial of the fence permit.

48. The Township informed Natalie that the decision was just a "hold on the review" of the fence permit, and instructed her to contact Mr. Roda.

49. The Mains subsequently retained counsel to assist with the permitting requirements, and a meeting was arranged with the Township.

50.    On August 22, 2024, Andrew Main and the Mains' attorney met with Mr. Roda and other Township representatives, including the Township's legal counsel, to discuss the permit requirements.

51.    At that meeting, Andrew again informed Mr. Roda (and the other meeting attendees) that A.M. was disabled, and that a fence was necessary for A.M. to be able to play in the backyard safely.

52.    Andrew also shared a letter from one of A.M.'s treating physicians with the Township, which explained why the fence was required and the benefit the fence would bring to A.M.

53.    Mr. Roda stated that he would not consider the letter at that time, and that the issue would need to be raised before the Environmental Board at a hearing on the permits the Mains would be requesting.

54.    Mr. Roda further stated that A.M.'s disabilities did not change what the Township would require for the permits.

55.    Mr. Roda also recommended that the Mains set up a temporary dog enclosure for their son while the permit applications were pending.

56.    The Mains found Mr. Roda's suggestion incredibly disturbing and distressing.

57.    When Andrew conveyed Mr. Roda's comments to Natalie, who was 38 weeks pregnant at the time, Natalie became distressed and began having contractions.

58.     On August 23, 2024, Natalie contacted Mr. Roda via email and requested information regarding the mapping he was requiring for the permits, so that any agreement for services related to the permits would cover all requirements.

59.     Around noon on August 23, Mr. Roda contacted Natalie and left a voicemail in response to Natalie's email. Natalie returned Mr. Roda's call shortly after, to discuss what options were available to the Mains for a fence permit.

60.     On that call, Natalie was informed that the fence must be in the backyard, and "no exceptions" were allowed to that requirement. Mr. Roda also stated that a wetland delineation would be required even if the Mains wanted to install a significantly smaller fence that avoided any protected areas.

61.     Mr. Roda explained that this was because he was "confident" the wetland had expanded, so a boundary would need to be established.

62.     When discussing the wetland delineation, Natalie mentioned the landscaping work that had been done on the Property in July 2024.

63.     After Natalie mentioned the landscaping work, Mr. Roda offered to do the Mains a "favor" and perform the delineation himself on behalf of the Township.

64.     For this, Mr. Roda stated that he could "come by," solely to "take a look" at the possible wetland boundary and to know exactly what to expect.

65.     Mr. Roda represented that this would be an informal visit, and that he would need to return with the necessary equipment to perform the delineation.

***The Township Issues the First Code Compliance Request, Identifying Purported Violations of Township Ordinances and Requiring the Mains to Obtain Certain Permits to Cure the "Violations"***

66.     On or around August 26, 2024, Mr. Roda visited the Property and spoke with Andrew.

67.     When reviewing the Property, Mr. Roda stated that he could see why the Mains thought the area was not a woodland, because it appeared to be clear.

68.     However, Mr. Roda further stated that the Mains would need to conduct a topography survey to verify the standard of the topsoil added in July, and noted that the hill in the yard "seemed artificial."

69.     Mr. Roda then went into the wooded area at the back of the Property and, when he returned, asked Andrew if the Mains had any landscaping work performed in that portion of the Property.

70.     After Andrew confirmed they had not, John stated that the wooded area was "covered in debris" and "completely disturbed."

71.     The debris Mr. Roda had observed was weathered and dirty, and appeared to have been present for a long time. The Mains did not deposit any of the debris in the wooded area.

72.     Mr. Roda then stated that there were "multiple violations" on the Property, and speculated that the wetland had likely expanded over time.

11

73.     Mr. Roda also represented to the Mains that the Township requires a permit to "pull even a weed" within a woodland.

74.     Mr. Roda stated that the Township would need to visit the Property again to take photographs and document the state of the Property, and that the Mains would be responsible for restoring any afflicted woodland and wetland areas, including the pre-existing debris and disturbance.

75.     Mr. Roda also informed Andrew that the fence could not be considered before the restoration.

76.     On September 5, 2024, Michelle Gartland, an Environmental & Project Analyst for the Township, visited the Property and requested access to take pictures of the backyard area.

77.     Because Natalie had given birth the day before, the Mains asked Ms. Gartland to return at a later date.

78.     Ms. Gartland returned to the property approximately one week later, and took photos of the Mains' backyard.

79.     Following that visit, the Mains received a letter titled "Code Compliance Request" from the Township. **Exhibit A** (the "First CCR").

80.     The First CCR identified purported "Violations of the Code of Ordinances for West Bloomfield Township," which were described as "unauthorized activities without the benefit of having the proper permits obtained." *Id*. at 1.

12

81.     The First CCR referenced the following sections of the West Bloomfield Charter Township Code ("WBC"):

a.  WBC § 26-3.1.21(C)(i), requiring a permit for "cutting of trees or harvesting of forest products within a woodland'"

b.  WBC § 12-91, requiring a permit for certain operations in a wetland;

c.  WBC § 26-5.4(3)(B)(i) and (iii), requiring a permit for any work in an environmental features setback; and

d.  WBC § 8-310 and § 8-376, requiring grading and soil erosion permits for certain operations on a property. *Id*. at 1-2.

82.     The First CCR further stated that the Mains would be required to apply for an "after-the-fact woodland permit," an "after-the-fact wetland/25-foot environmental feature setback permit," and a "grading and drainage/soil erosion and sedimentation control permit." *Id*.

83.     Upon information and belief, the woodland and environmental feature permits were required to be "after-the-fact" permits because of the historic debris and prior landscaping work on the Property.

84.     The First CCR also stated that the Mains "MUST HIRE A WETLAND CONSULTANT AND HAVE A WETLAND DELINEATION COMPLETED. THEN, MUST APPLY FOR A WETLAND DETERMINATION CONFIRMATION

FROM WEST BLOOMFIELD TOWNSHIP." The First CCR does not refer to any Township ordinance or other law for the wetland delineation "requirement." *Id*. at 2.

85.    In addition, the First CCR warned the Mains that they must "correct all violations prior to 10/05/24; otherwise court action may be initiated." *Id*.

86.    After receiving the First CCR, the Mains worked to obtain the permits identified therein.

### *The Mains Obtain a Wetland Delineation*

87.    The Township publishes a wetland map on its website, which the website describes as "[a] basic viewer showing regulated wetlands within the Township." West Bloomfield Charter Township, *Township Maps – Natural Resources – Wetlands*, https://wbt-gis.maps.arcgis.com/apps/instant/basic/index.html?appid=32aff41426a14 030a08a2fa302b4eac9 (last visited May 1, 2026) (the "Wetland Map").

88.    At the time the Mains purchased the Property, and at all times since, the Wetland Map only identified wetlands on a small portion of the Property, as follows:



*Id*.

89.     Similarly, the U.S. Fish and Wildlife Service only identifies a wetland area on a small portion at the rear of the Property. **Exhibit B**, at 10.

90.     Still, Mr. Roda confirmed to the Mains that a wetland delineation would be required for any of the Mains' permit applications to be processed and reviewed.

91.     Prior to that wetland delineation, the Mains hired new counsel, Brandon Kizy, to assist with the real estate aspects of the permitting process.

92.     On October 9, 2024, Andrew Main and Mr. Kizy again met with Mr. Roda, as well as Michelle Gartland and the Township's legal counsel, to discuss what would be required to obtain the permits and move forward with installing the fence.

93.     The Mains requested a checklist or other written guidance regarding what would be required for the permit applications. The Township did not provide any such checklist or written guidance.

94.     Indeed, to date, the Township has not provided any definitive list of requirements for the permit applications, despite the Mains' multiple requests.

95.     On October 11, 2024, Mr. Kizy emailed the Township (Ms. Gartland, Mr. Roda, and the Township's legal counsel) to confirm the steps the Mains would need to take to submit the permit applications, as discussed at the October 9, 2024 meeting.

96.     These steps Mr. Kizy identified included: (1) hiring an environmental consultant or requesting an assessment from EGLE; (2) hiring a surveyor to conduct a "total woodland calculation," (3) submitting a site plan, (4) applying for a wetland

15

determination verification; and (5) obtaining and submitting a proposal from a landscape architect.

97. In response, Mr. Roda provided additional information regarding the wetland determination but did not identify any further requirements for the permit applications.

98. Because EGLE would not be able to complete a wetland delineation prior to the first frost, the Mains hired Marx Wetlands, LLC ("Marx Wetlands"), to conduct the wetland delineation.

99. Marx Wetlands completed the wetland delineation on October 21, 2024, and issued its report on October 22, 2024 (the "Wetland Report"). *See* **Ex. B**.

100. The delineation was performed in accordance with technical standards issued by the State of Michigan. *Id*. at 1.

101. The Wetland Report identified a larger portion of the Property as wetland than was and is designated on the Wetland Map. *Compare* ¶ 68; *with* **Ex. B**, at 21.

102. Because the wetland area was determined to have expanded, the Township's setback requirements now (presumably) encroach further into the Property's backyard space. *Id*.

103. The Mains do not have any specialized knowledge or expertise relating to wetlands beyond that of a reasonably intelligent person.

104.   Prior to the wetland delineation and determination, the Mains did not observe that the area the Wetland Report identified as "wetland" had any characteristics that would suggest the wetland area had expanded beyond what is designated on the Wetland Map.

105.   The Mains first became aware that the identified wetland area may have expanded from the Township map's depiction when Mr. Roda (who is a certified Professional Wetland Scientist) visited the Property in August 2024, observed the conditions on the Property, and informed the Mains of his initial impressions based on his observations.

106.   Critically, the landscaping work performed on the Property in July 2024 did not touch any portion of the Property that is located within 25 feet of the area designated as "wetland" on the Property according to the Wetland Map.

107.   The Wetland Report and a Wetland Determination Verification Application were submitted to the Township on October 23, 2024.

108.   The Township, through Mr. Roda, issued its Wetland Determination Verification Report on October 28, 2024 (the "Wetland Verification").

109.   The Wetland Verification does not provide that the determination will apply to the Property for any particular length of time, does not establish that any portion of the Property will *not* be considered wetland following the determination,

17

and advises that "the wetland boundary and extent on the site can change from time to time."

110. As of the time of this Complaint, the Wetland Map has not been updated to reflect the new boundaries in the Wetland Verification.

### *The First Permit Application and Administrative Denial*

111. After obtaining the Wetland Verification, the Mains continued to work to fulfill the permit requirements, which included hiring third parties to conduct surveys and studies.

112. In November 2024, the Mains obtained a survey of the Property from Wolverine Engineers & Surveyors, Inc., and a topography survey from JW CivilWorks, LLC ("JW CivilWorks").

113. In December 2024, JW CivilWorks prepared a proposal for the Mains' Property, where they would provide plans and specifications for the permits and the proposed projects and restoration.

114. The Mains accepted the proposal, and JW CivilWorks prepared the plans and documents for the permit applications. This included a grading plan, diagrams of wetland fill area, a soil erosion and sedimentation control plan, and a wetland restoration and landscape plan.

115. The Mains also obtained a limited tree survey from Marx Wetlands, which identified all trees located between the edge of the woodland boundary and the wetland boundary that had trunks six inches in diameter or larger.

116. The Mains submitted their first permit application and paid the accompanying fees to the Township on February 11, 2025 (the "First Permit Application").

117. The First Permit Application included the plans and documents JW CivilWorks prepared, as well as the limited tree survey from Marx Wetlands.

118. On February 19, 2025, Mr. Roda sent a letter to the Mains, informing them that the First Permit Application was administratively denied due to being "incomplete as received," and provided comments regarding what would be required for a complete application.

119. These comments were not grounded in any requirements provided by the West Bloomfield ordinances, and were often duplicative.

120. Many of the comments requested information that had already been submitted, or did not apply in the first instance. This includes, but is not limited to, the following:

   a. "Identify the linear footage of the proposed fence within the woodland area." The linear footage was identified (148.4 feet).

19

b. The letter requested a restoration plan for a woodland taking request exceeding 25%. There was no request exceeding 25%.

c. "Please include the proposed woodland taking percentage." The "woodland taking percentage" (which is not defined in the Township's zoning ordinance) was included (24.93%).

d. "All restoration areas must include a biodegradeable soil erosion control mulch blanket . . . ." This requirement was already included in the First Permit Application.

e. The letter required a restoration landscaping plan. The restoration plan was included in the First Permit Application.

121. In addition, the zoning review attached to the February 19, 2025 letter stated that there were no permits for the shed and portion of the deck that were located within the area the Town designated as woodland. The shed and the deck had been built previously, prior to the time the Mains purchased the Property.

122. The Township also included a handwritten comments on a copy of the plans the Mains had submitted, requesting "new contours" due to the soil that had been added to the Property. Those contours were already included, identified as the "2024 Field Surveyed Contours."

123. Regardless, the Mains worked to address all comments and provide complete permit applications to the Township.

### *The Second Permit Application and Administrative Denial*

124.   Once the Mains believed all the Township's comments had been addressed, the Mains submitted their second permit applications (the "Second Permit Application") on March 21, 2025.

125.   With this submission, the Mains provided a letter from JW CivilWorks that addressed each of the Township's comments on the First Permit Application and confirmed that all required information was included with the Second Permit Application.

126.   The Mains also requested to defer further plan revisions until the application could be reviewed by the Township's Environmental Commission.

127.   Despite this, on April 11, 2025, Mr. Roda sent a letter to the Mains, informing them that the Second Permit Application was administratively denied due to being "incomplete as received," and providing comments regarding what would be required for a complete application.

128.   The April 11, 2025 letter also stated that even if the Mains wanted to defer plan revisions and have the Environmental Commission review the application, certain revisions would still be necessary.

129.   Upon information and belief, Mr. Roda did not provide the Second Permit Application to the Environmental Commission.

130. No hearing was ever conducted with respect to the First Permit Application or the Second Permit Application.

131. As with the February 19, 2025 letter, Mr. Roda's comments were not grounded in any requirements provided by the West Bloomfield ordinances, imposed new requirements that had not been stated previously, were often duplicative, and requested information that had already been submitted, or that did not apply in the first instance.

132. The April 11, 2025 letter also included comments from the zoning review which, among other things, noted that a portion of the back deck fell within the "protected [woodland] area."

133. Upon information and belief, and review of historical aerial imagery maintained by the Township, the deck was installed prior to the time the Township adopted the current map that designates the area as woodland.

134. The handwritten comments to the Second Permit Application also took issue with the lawn existing within the designated woodland area. As with the deck, review of historical imagery maintained by the Township shows the lawn space has existed since at least 1980, long before the area was designated as woodland.

### The Third Permit Application and Administrative Denial

135. After the second denial, the Mains sought to confirm all permit application requirements and ensure their applications were complete.

22

136.    To do this, the Mains and Mr. Kizy met with Mr. Roda, the Township's legal counsel, and a Township engineer on May 1, 2025.

137.    At the May 1 meeting, Mr. Roda requested additional information before he would agree to submit a permit application to the Environmental Commission, including relocating the proposed fence line, providing additional details on the woodland calculations, and adding certain measurements.

138.    Then, the Mains hired Great Lakes Landscape Design to address the restoration plans and update the plans as required.

139.    In July 2025, Great Lakes Landscape Design spoke with Mr. Roda directly to confirm all application requirements.

140.    Great Lakes Landscape Design then conveyed to the Mains that Mr. Roda had represented that all permit work would need to be restarted, and that Mr. Roda had identified further violations on the Property and steps that would need to be taken to resolve them.

141.    Many of these requirements did not appear to relate to the Township's purported restoration and environmental preservation goals.

142.    For example, the Township sought to require the Mains to remove historic fill material located within the wetland.

143. This fill material, which had not been added to the Property by the Mains, was approximately three inches deep, concentrated around the base of one tree, and removal would cause more harm to that tree than leaving the fill material in place.

144. Regardless, the Mains continued to work with their consultants to prepare a third submittal that would satisfy the Town's demands.

145. For this, the Mains also hired Nowak & Fraus Engineers to prepare updated survey documents and conduct additional tests as needed.

146. The Mains also had Great Lakes Landscaping conduct a soil analysis to address concerns regarding fill material along the proposed fence line. The soil analysis determined that approximately 1-2 inches of fill material was present along only the back 15 feet of the 45-foot proposed fence line.

147. The Mains were able to submit their third permit applications (the "Third Permit Application") on October 14, 2025. This submittal included a letter from Nowak & Fraus Engineers that specifically addressed the Township's comments on the Second Permit Application, and confirmed that the required information was included with the Third Permit Application.

148. On November 4, 2025, Mr. Roda sent a letter to the Mains, informing them that the Third Permit Application was administratively denied due to being "incomplete as received," and providing comments regarding what would be required for a complete application.

24

149. As with the previous letters, these comments were not grounded in any requirements provided by the West Bloomfield ordinances, imposed new requirements that had not been stated previously, were duplicative, and requested information that had already been submitted or that did not apply in the first instance.

150. The problematic comments include, but are not limited to a demand that the Mains conduct a tree survey, identifying and describing *all* trees located within the woodland area on the Property.

151. The Mains had submitted a tree survey with the Third Permit Application. That survey limited to identifying all trees with a six-inch diameter trunk or larger.

152. The "requirement" to include a survey of *all* trees is contrary to the Township's zoning ordinance. *See* WBC § 26-3.1.21.E.i.c.6.A.i.

### *The Township's Actions Give Rise to Municipal Liability*

153. The Mains have been attempting to work with the Township to reach some resolution, and the parties have reached an impasse.

154. The Fourteenth Amendment to the U.S. Constitution protects against arbitrary and irrational exercise of governmental power that interfere with property rights and personal liberties, and secures the Mains' rights, privileges, or immunities by prohibiting states and their instrumentalities such as the Township from making or enforcing any law "which shall abridge the privileges or immunities of citizens of the

25

United States[,]" and by prohibiting the Township from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV.

155. The Township has repeatedly blocked the Mains' proposed fence, issued written determinations of code "violations," refused to process the Mains' permit applications, causing the Mains to incur significant costs, and prevented Plaintiffs from the equal enjoyment of the property.

156. Indeed, the Township's actions to date are entirely consistent with Mr. Roda's initial promise: that the fence is "***never going to happen***."

157. The Township's actions are attributable to the formal written policy set forth in the Township's ordinances.

158. The Township's ordinances, as applied and enforced, violate the Mains' substantive due process rights.

159. The Township's actions are also attributable to Township policy or custom, where Mr. Roda acts as an official with final decision-making authority.

160. That is, Mr. Roda acts as "gatekeeper" for issuing notices of code violations and reviewing permit applications, and enforces Township ordinances arbitrarily and capriciously, with deliberate indifference to the Mains' constitutional rights.

161. To the extent Mr. Roda is deemed to not be a final decisionmaker, Township officials know of and have ratified Mr. Roda's actions.

162. The Township's actions are also attributable to Township policy or custom, because the Township has a pattern or practice of unconstitutional enforcement of the Township's zoning ordinances and environmental permit requirements.

163. The Township's practices are persistent, longstanding, and widespread, so that Township officials with policy-making authority tacitly authorized the policy, had actual or constructive knowledge of the widespread custom and policy, and failed to do anything to end the unconstitutional custom and policy.

164. The Township's actions are also attributable to the Township perpetuating an unconstitutional policy or custom, when the Township knowingly, and with reckless and deliberate indifference to the constitutional rights of its citizens, failed to adequately train, supervise, and discipline the individuals responsible for enforcing Township ordinances.

165. The Township's (1) formal written policy, as well as (2) the Township's policy or custom where Mr. Roda acts as the final decisionmaker with respect to environmental enforcement and permitting, (3) the Township's pattern or practice of unconstitutional enforcement of the Township's ordinances, and (4) the Township's failure to adequately train, supervise, and discipline its employees, deprived the Mains of the substantive due process guaranteed under the Fourteenth Amendment of the Constitution of the United States of America.

166. The Mains' ownership interest in the Property, as well as the Mains' vested interest in the use, possession, and alienation of their Property, are property rights as defined under Michigan law and protected by the Fourteenth Amendment.

167. In addition, the Mains "have a substantive due process right not to be subjected to arbitrary or irrational zoning decisions." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1217 (6th Cir. 1992).

168. The Township is depriving the Mains of their constitutional and civil rights, including their vested interest in the use, possession, and alienation of their Property, and subjecting the Mains to arbitrary and irrational zoning decisions.

169. The Township has threatened the Mains with criminal consequences, and has threatened to block or otherwise impair any sale of the Property to a third party until the items identified in the First CCR are resolved to the Township's satisfaction.

170. Indeed, at an October 9, 2024 meeting, Ms. Gartland, told the Mains that even if the Mains were able to sell their home, the Township will "go after them until [the Township] get[s] what it wants."

171. Further, public records associated with the Property reflect an ongoing enforcement action related to the permits, with unresolved "[v]iolation(s)."

172. And, on May 1, 2026, the Mains received an updated "Code Compliance Request" letter from the Township, via U.S. Mail (non-certified). **Exhibit C** (the "Second CCR").

173. The Second CCR, which is dated April 23, 2026, again references "unauthorized activities without the benefit of having the proper permits obtained," and an inspection on August 26, 2024. *Id*. at 1.

174. The Second CCR further instructs the Mains to "correct all violations prior to 05/26/2026; otherwise court action may be initiated." *Id*. at 2.

175. As such, the Mains have a credible fear of prosecution if they are unable to satisfy the Township's arbitrary permit "requirements."

176. As a consequence of the Township's unlawful actions, the Mains have been forced to spend thousands of dollars to satisfy the Township's ever-shifting permit requirements, to be able to obtain permission to remediate the "violations" the Township identified in the first instance.

177. As a consequence of the Township's unlawful actions, the Mains continue to be unable to perform any work within their backyard space – including work that would *remediate* any damage caused to the wetland area by the debris that was placed prior to the Mains' purchase of the Property, or any work that would facilitate the Township's *purported* objective of environmental protection.

178. The Township's policies, customs, practices, failure to train, failure to supervise, and ratification were the moving forces behind the constitutional violations inflicted on the Mains.

179. Further, as a consequence of the Township's unlawful actions, Plaintiffs also have been deprived of the opportunity to make reasonable modifications to their property, to accommodate A.M.'s disabilities.

180. Without the fence, A.M. cannot play outside safely without supervision, which requires physical closeness to prevent any attempt to run away from the Property.

181. Especially with their four other children, the level of supervision A.M. requires in an unfenced yard is almost always impossible for the Mains to provide.

182. Consequently, A.M. is rarely able to have the outside time his doctor recommended. As a result, the Mains have observed that A.M. has had additional meltdowns, and the symptoms of his disabilities are less manageable.

183. As a consequence of the Township's unlawful actions, Plaintiffs have suffered and continue to suffer irreparable harm, as well as economic damages.

## COUNT I – SUBSTANTIVE DUE PROCESS – VOID FOR VAGUENESS
### WBC § 26-3.1.21 (52 U.S.C. § 1983) (*Plaintiffs Andrew Main and Natalie Main*)

184. Plaintiffs incorporate in full herein the preceding paragraphs of this Complaint.

185. WBC § 26-3.1.21 (hereinafter, the "Woodlands Ordinance") provides for restrictions and certain permits relating to properties containing "woodlands."

30

186.   Violations of the restrictions in the Woodlands Ordinance are deemed misdemeanors, punishable by up to 93 days in jail and/or a fine of up to $500. WBC § 26-3.1.21.M *and* § 1-10(a)-(b).

187.   WBC § 26-2 sets forth the following definitions relative to this dispute and the Woodlands Ordinance:

**Forest products** is a term describing those wood related items from a woodlands to include veneer logs, saw logs, firewood, pulpwood, pole trees, groundcover, branches, boughs and whole trees and/or saplings for transplanting.

**Tree** shall mean a woody plant which attains the height of at least ten (10) feet at maturity and has a single main stem (trunk).

**Tree stand** shall mean a group of trees within a woodland at least one (1) acre in area, related in terms of common soils, common species, and related in terms of the size of trees within the overall group.

**Woodland** shall mean an area shown and identified as woodland on the official woodland map of the township. (The criteria for identifying the mapped woodland areas are: at least three (3) contiguous acres and the existence of canopy coverage over more than one-half of the area or average tree density of thirty (30) square feet of tree trunk area per acre (basal area).)

**Woodland construction envelope** shall mean the area of direct disturbance in woodland determined under Section 26-3.1.21, anticipated to be caused by clearing or construction activities for buildings, driveways, parking, and/or other activities which cause disturbance to woodland. Woodland disturbance configuration shall mean the location of permitted clearing or construction activities causing disturbance within a woodland resulting from construction activities such as, but limited to, installation of buildings, roadways, driveways, parking areas, utilities, and retention basins.

**Woodland harvesting** is a term to describe the cutting of trees or removal of forest products from woodland.

31

**Woodland tree cutting** means any act within a designated woodland area to cut down, remove all or a substantial part of a tree, or damage a tree or other vegetation that will cause the tree or other vegetation to be negatively impacted or die. (Such acts shall include, but shall not be limited to, damage inflicted upon the root system of the vegetation by any equipment and/or vehicles, by the placement of any materials, by changing the natural grade, or by any other alteration of natural physical condition.)

188. WBC § 26-3.1.21.C describes "Woodlands Permits Generally," and subsection (i) provides that "[t]he cutting of trees or harvesting of forest products within a woodland shall be subject to a permit process, and no cutting or harvesting shall be performed without such permit having first been issued."

189. WBC § 26-3.1.21.C then provides different characterizations of tree cutting generally, referring to subsequent sections of the Woodlands Ordinance for each, and stating, in relevant part:

v. Subdivision lots predating ordinance. Where a permit request involves the cutting of trees or removal of forest products lying within a woodland on an existing lot or outlot within a one-family subdivision approved prior to the adoption of the woodland ordinance, the township shall apply those provisions contained in subsection H.

vi. Woodland harvesting. Where a permit request does not involve a site plan or plat lying either wholly or partially within a woodland, the woodland review board shall evaluate the petition and direct the environmental director or manager on the disposition of the requested permit utilizing those provisions contained in subsection D.

190. Relative to WBC § 26-3.1.21.C.v, § 26-3.1.21.H states:

i. Acts for which a permit is not required. On those lots or outlots within one-family subdivisions that received final plat, final preliminary plat or final site plan approval prior to the adoption of the woodland provisions of the zoning ordinance and any subsequent amendments

thereto, any tree within ten (10) feet of the approved location of a one-family dwelling and its accessory driveway, single garage and underground utilities may be cut without a permit. This exception to the permit requirement does not apply to other accessory buildings or structures.

ii.     Permit required. Except as provided in subsection H.i. above, a woodland permit shall be required for the removal of any other tree on an existing one-family residential lot within a woodland. The application and review process shall be in accordance with subsection E.

191.   Relative to WBC § 26-3.1.21.H, § 26.3.1.21.E.i.a states that "[t]here shall be no cutting of trees or harvesting of forest products lying either wholly or partially within a woodland for the purpose of developing a site plan or plat without there first having been a woodland permit applied for and a permit issued by the township."

192.   There are also separate "requirements" for the different woodland permits described in WBC § 26-3.1.21.D and E.

193.   Section 3.1.21.D does not contain any criteria to guide a decision on whether to grant or deny a woodland permit, or procedural controls.

194.   WBC § 26-3.1.21.E contains criteria for the determination of the "woodland disturbance configuration," but does not contain any criteria to guide a decision on whether to grant or deny a woodland permit that requests less than the 25% permitted woodland taking, or procedural controls.

33

195. WBC § 26-3.1.21.E contains criteria and requirements for a site plan or plant to be submitted to the reviewing authority, but does not contain any criteria or requirements for a woodland permit application that does not relate to "cutting of trees for the purpose of developing a site plan or plat."

196. Notwithstanding the permit requirements under WBC § 26-3.1.21, however, WBC § 26-3.1.21.N states:

> Nothing in this section shall be construed to limit or prohibit the regular trimming, pruning and maintenance of trees; the removal of dead, diseased or dying trees; or the trimming of trees which might reasonably be expected to cause injury to persons or property . . . if left unattended.

197. The Township's ordinances reflect the Township's formal written policy.

198. The Township's permitting and enforcement processes related to the Woodlands Ordinance, are approved, maintained, and applied under the direction and authority of Mr. Roda.

199. The Township, through Mr. Roda, has asserted that the Mains violated WBC § 26-3.1.21.C.i, and has required that the Mains obtain an "after-the-fact woodland permit."

200. The Township has not identified whether they are purporting to require an "after-the-fact woodland permit" pursuant to § 26-3.1.21.D or E.

201. As best the Mains can discern, they suspect that the Township is seeking the permit under WBC § 26-3.1.21.E, because the 25% taking entitlement does not appear in § 26-3.1.21.D.

202. However, subsection E, as written, appears to relate only to when the applicant is "developing a site plan or plat," which does not apply to the Mains' Property.

203. And, in the event the Township is only relying on WBC § 26-3.1.21.C.i, this section merely references "a permit process," and does not contain any criteria or requirements for a woodland permit application or procedural controls whatsoever.

204. Regardless, the "requirements" the Township has sought to impose on the Mains are either not contained in the Woodlands Ordinance at all, or do not comport with the procedures under C, D, or E (to the extent such procedures exist).

205. And, even if the Township did have procedures it could follow and was following, the Woodlands Ordinance contains inconsistent and conflicting obligations.

206. As just one example, as written, § 26-3.1.21.D applies to "harvesting of forest products," which presumably relates to gathering forest products as a crop, but also to "cutting of trees" which, depending on the interpretation of the term "trees" (as opposed to "forest products") could be read to also apply to the Mains' permit applications.

207. As another example, WBC § 26-3.1.21.N prevents trimming, pruning, and maintenance of trees, which could be reasonably understood to include the

clearing of invasive species and underbrush that could harm trees, but conflicts with the permit requirements in § 26-3.1.21.D and E.

208.  To provide fair notice and satisfy the due process requirements under the Fourteenth Amendment, a law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

209.  "[W]here a [law] imposes criminal penalties, the standard of certainty is higher," *Kolender v. Lawson*, 461 U.S. 352, 359 n.8 (1983), and a law "may be facially invalid even if it has some conceivable application." *Springfield Armor, Inc. v. City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994).

210.  The Woodlands Ordinance is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment because it does not provide fair notice of the type of conduct prohibited or required.

211.  The Woodlands Ordinance is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment because it lacks standards to guide those charged with the administration of the Woodlands Ordinance.

212.  The Woodlands Ordinance is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment because it imposes inconsistent and conflicting obligations, which encourages subjective and discriminatory application by delegating to those empowered to enforce the ordinance the unfettered

36

discretion to determine whether the Woodlands Ordinance has been violated and to determine what will be demanded in connection with woodlands permits.

213.  The Michigan Court of Appeals has previously held that similar language in a prior version of the Township's Woodlands Ordinance is unconstitutionally vague because it granted "untrammeled authority" to the enforcing body, among other things. *See generally W. Bloomfield Charter Twp. v. Karchon*, 209 Mich. App. 43 (1995).

214.  The Township is a "person" under 42 U.S.C. § 1983.

215.   The Township issued the Woodlands Ordinance under color of state law, and the Woodlands Ordinance reflects the Township's formal written policy.

216.  The Mains' ownership interest in the Property, as well as the Mains' vested interest in the use, possession, and alienation of their Property, are property rights as defined under Michigan law and protected by the Fourteenth Amendment.

217.  In addition, the Mains "have a substantive due process right not to be subjected to arbitrary or irrational zoning decisions." *Pearson*, 961 F.2d at 1217.

218.  The Woodlands Ordinance deprives the Mains of rights owed to them and secured by the Constitution, in violation of the Fourteenth Amendment, and has caused the Mains to incur damages.

219. The Mains have suffered harm because they are unable to govern their behavior to comply with the Woodlands Ordinance, and are subject to the credible threat of criminal enforcement from the Township as a result.

220. The Mains have further suffered and/or will suffer irreparable harm for which money damages cannot compensate them, such that preliminary and permanent injunctive relief are appropriate.

## REQUEST FOR RELIEF

WHEREFORE, the Mains respectfully request that this Honorable Court:

(1) Enter a judgment declaring that WBC § 26-3.1.21 is unconstitutionally vague in violation of the Due Process Clause on its face;

(2) Enjoin the Township, its employees, officers, and agents, from enforcing WBC § 26-3.1.21 against the Mains and in relation to the Property permanently and preliminarily while this litigation is pending;

(3) Award the Mains monetary damages in an amount to be proven at trial;

(4) Award the Mains their reasonable costs, including attorneys' fees, incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

(5) Grant such other and further relief as this Court deems just and proper.

## COUNT II – SUBSTANTIVE DUE PROCESS – VOID FOR VAGUENESS WBC § 26-5.4 (42 U.S.C. § 1983) (*Plaintiffs Andrew Main and Natalie Main*)

221. Plaintiffs incorporate in full herein the preceding paragraphs of this Complaint.

38

222.   WBC § 26-5.4.2 (hereinafter, the "EFS Ordinance") states that: "[a]n environmental feature setback shall be maintained in relation to all areas defined in this section as being an 'environmental feature,' unless, and to the extent, it is determined to be in the public interest not to maintain such a setback."

223.   The environmental features subject to the setback requirement include "any: 1. Watercourse; or 2. Wetland." WBC § 26-2.

224.   WBC § 26-2 further defines a "wetland" as "land characterized by the presence of water at a frequency and duration sufficient to support and that under normal circumstances does support wetland vegetation or aquatic life and is commonly referred to as a bog, swamp, or marsh."

225.   The mandatory setback area is generally designated as 25 feet "from the boundary or edge of a wetland," "[u]nless otherwise determined by the body undertaking the plan review." WBC § 26-5.4.5.

226.   Within that setback area, "unless and only to the extent determined to be in the public interest by the body undertaking the plan review," the EFS Ordinance prohibits:

> [R]emoval, deposition or assembly of materials or structures, permanent or temporary, above or below the surface of the land or water, including, but not limited to, houses, buildings, plants, bulkheads, piers, docks, rafts, landings, dams or waterway obstructions; removal of any soils, minerals or vegetation; dredging, filling or land balancing; or constructing or undertaking seasonal or permanent operations.

WBC § 26-5.4.3.C.

227. WBC § 26-5.4.3.D then sets forth a "balancing test" with "general criteria" to be used when "determining whether the proposed construction or operations are in the public interest."

228. Violations of the environmental feature setback restrictions are deemed misdemeanors, punishable by up to 93 days in jail and/or a fine of up to $500. WBC § 1-10(a)-(b).

229. The EFS Ordinance does not explicitly state that a property owner may apply for a "use permit" to perform any of the prohibited activities within an environmental features setback.

230. Rather, the EFS ordinance makes various references to a "use permit," and "application to perform work," which presumably relates to a request for "authorization to . . . undertake an operation in, on or adjacent to an environmental feature." WBC § 26-5.4.3.B.

231. The ordinance permits a "use permit" to "be approved administratively," so long as the permit "does not involve, include or propose" an "after-the-fact" permit (among other things). WBC § 26-5.4.4.B.

232. When an applicant requests an administrative permit, their use permit application must contain certain items, as described in WBC § 5.4.4.C.

233. When an application for an *administrative* permit is submitted, the "environmental department director shall review an application for an administrative

permit to determine if it is complete," "provide written notice" of any additional information that is required, and determine whether the "administrative permit should be issued." WBC § 26-5.4.4.D.

234. The EFS Ordinance further provides for other conditions, restrictions, and procedures for an "administrative permit." *See generally* WBC § 26-5.4.

235. Because the Mains are seeking an after-the-fact permit, the Township is not permitted to issue the Mains an administrative permit and, therefore, the Mains are not subject to the requirements for an administrative permit.

236. The EFS Ordinance does not contain any requirements (or even guidelines) for what information must be included in a non-administrative use permit application, or any procedural controls. *Id*.

237. Though the permit form the Township promulgates contains a list of submission requirements, those "requirements" are not contained in or authorized by the Township's ordinances.

238. Instead, WBC § 26-5.4.3.B merely states that the planning and environmental director permit application "shall refer" the permit application to the appropriate reviewing body.

239. The ordinance does not contain any guidelines for when the non-administrative permit application must be referred, for "administrative review" of the

application, or for when it may be appropriate to administratively deny a non-administrative permit application. *See generally* WBC § 26-5.4.3.B.

240.   In addition, other than the definition of "wetland" described in WBC § 26-2, the EFS Ordinance does not set forth any procedures or criteria for the manner in which a property or portion of a property should be determined to be a wetland subject to the setback requirement in the first instance.

241.   To be sure, the Township did adopt the Wetland Map. However, as set forth in WBC § 12-53(c),[1] "[t]he adoption of the . . . wetland map by the township board shall not create any legally enforceable presumptions regarding whether property that is or is not included on the inventory map is or is not a wetland."

242.   Similarly, the Township's ordinances do not require that a property owner obtain any "wetland delineation" to apply for a use permit.

243.   The Township's ordinances do not authorize any particular person or entity to issue a determination of whether a certain property or portion of that property constitutes a "wetland."

244.   The Township's website does contain application forms for a "Wetland Determination Verification Application" and a "Wetland Determination Application." These application forms do not reference any Township ordinance or other law.

---

[1] Chapter 12 of the Township's ordinances relates to wetlands generally. It does not incorporate any portion of Chapter 26, nor does Chapter 26 incorporate any portion of Chapter 12.

245. The Township's ordinances do not appear to provide for any appeal of a wetland determination on a particular property.

246. However, WBC § 12-12(1) requires notice and a public hearing for proposed changes to the Township's wetland map, despite that map not creating "any legally enforceable presumptions." WBC § 12-53(c).

247. The Township's permitting and enforcement processes related to the environmental feature setback, including any wetland determinations, are approved, maintained, and applied under the direction and authority of Mr. Roda.

248. The Township, through Mr. Roda, has asserted that the Mains violated WBC § 26-5.4, and has required that the Mains obtain an "after-the-fact environmental features permit."

249. To provide fair notice and satisfy the due process requirements under the Fourteenth Amendment, a law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned*, 408 U.S. at 108; *see also Karchon*, 209 Mich. App. at 49 ("[A] person of common intelligence must be able to determine *from reading the ordinance whether part or all of his land is covered by the ordinance* and, if his land is included in the ordinance, what conduct is prohibited." (emphasis added)).

43

250.   When a law "regulates the conduct of the public at large and not a particular industry or subgroup," courts "do not impute specialized knowledge to the 'person of ordinary intelligence.'" *U.S. v. Caseer*, 399 F.3d 828, 837 (6th Cir. 2005).

251.   Moreover, "where a [law] imposes criminal penalties, the standard of certainty is higher," *Kolender*, 461 U.S. at 359 n.8, and a law "may be facially invalid even if it has some conceivable application." *Springfield Armor*, 29 F.3d at 252.

252.   The EFS Ordinance is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment because it does not provide fair notice of the type of conduct prohibited, because determining whether a property contains regulated wetland and is therefore subject to the setback requirements requires specialized knowledge and expertise, and the determination cannot be fairly ascertained by a "person of ordinary intelligence."

253.   The EFS Ordinance is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment because it does not provide fair notice of the type of conduct prohibited, because it does not provide for any enforceable determination of whether a property contains wetlands, under any circumstances.

254.   Even in its Wetland Determination Verification Letter, the Township has informed the Mains that a wetland's boundaries are subject to change at any time – meaning that it is *impossible* for the Mains (or any other property owner within the Township) to ascertain whether setback requirements apply at any given time.

44

255. The EFS Ordinance is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment because it lacks standards to guide those charged with the administration of the EFS Ordinance.

256. The EFS Ordinance is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment because it encourages subjective and discriminatory application by delegating to those empowered to enforce the ordinance and its permitting procedures the unfettered discretion to determine what will be demanded in connection with use permits.

257. The Township is a "person" under 42 U.S.C. § 1983.

258. The Township issued the EFS Ordinance under color of state law, and the EFS Ordinance reflects the Township's formal written policy.

259. The Mains' ownership interest in the Property, as well as the Mains' vested interest in the use, possession, and alienation of their Property, are property rights as defined under Michigan law and protected by the Fourteenth Amendment.

260. In addition, the Mains "have a substantive due process right not to be subjected to arbitrary or irrational zoning decisions." *Pearson*, 961 F.2d at 1217.

261. The EFS Ordinance deprives the Mains of rights owed to them and secured by the Constitution, in violation of the Fourteenth Amendment, and has caused the Mains to incur damages.

262.   The Mains have suffered harm because they are unable to govern their behavior to comply with the EFS Ordinance, and are subject to the credible threat of criminal enforcement from the Township as a result.

263.   The Mains have further suffered and/or will suffer irreparable harm for which money damages cannot compensate them, such that preliminary and permanent injunctive relief are appropriate.

## **REQUEST FOR RELIEF**

WHEREFORE, the Mains respectfully request that this Honorable Court:

(6) Enter a judgment declaring that WBC § 26-5.4 is unconstitutionally vague in violation of the Due Process Clause on its face;

(7) Enjoin the Township, its employees, officers, and agents, from enforcing WBC § 26-5.4 against the Mains and in relation to the Property permanently and preliminarily while this litigation is pending;

(8) Award the Mains monetary damages in an amount to be proven at trial;

(9) Award the Mains their reasonable costs, including attorneys' fees, incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

(10)   Grant such other and further relief as this Court deems just and proper.

**COUNT III – SUBSTANTIVE DUE PROCESS – ARBITRARY AND CAPRICIOUS – WBC § 26-3.1.21 and § 26-5.4 (42 U.S.C. § 1983)**
***(Plaintiffs Andrew Main and Natalie Main)***

264. Plaintiffs incorporate in full herein the preceding paragraphs of this Complaint.

265. The Fourteenth Amendment imposes an obligation on the Township to not act arbitrarily, capriciously, or irrationally, in adopting, implementing, and applying its laws.

266. That is, substantive due process requires that a governmental action or regulation be reasonable in its operation.

267. The Mains "have a substantive due process right not to be subjected to arbitrary or irrational zoning decisions." *Pearson*, 961 F.2d at 1217.

268. In addition, the Mains' ownership interest in the Property, as well as the Mains' vested interest in the use, possession, and alienation of their Property, are property rights as defined under Michigan law.

269. The Township violated the Mains' due process rights when the Township issued the Code Compliance Request, the Final Code Compliance Request, and any subsequent determination of alleged code violations, arbitrarily and capriciously, and without a valid governmental purpose.

47

270. The Township violated the Mains' due process rights when the Township refused to process the Mains' applications for after-the-fact permits and imposed arbitrary and irrational "requirements" related to those permit applications.

271. In other words, the Township has "thwarted any possible redress of the alleged environmental disturbance." *Grossman v. Charter Twp. of W. Bloomfield*, Case No. 23-11851, 2025 WL 475841, at *7 (E.D. Mich. Feb. 12, 2025).

272. The Township's actions were not a rational way to advance its purported goal of remediating the purported violations and alleged environmental degradation, and thus were arbitrary and capricious.

273. The Township's actions do not comport with the notions of fair play and decency.

274. The Township's actions have been made without foundation in reason and are merely arbitrary or an irrational exercise of power having no substantial relation to the public health, morals, safety, or welfare.

275. The Township is a "person" under 42 U.S.C. § 1983.

276. The Township's actions were taken under color of state law, and pursuant to a policy or custom.

277. The Township's actions have deprived the Mains of rights owed to them and secured by the Constitution, in violation of the Fourteenth Amendment.

278. The Township's determination of the alleged violations of the Environmental Features Ordinance, and the Township's demands in relation to the after-the-fact permits, have caused the Mains to suffer damages.

279. The Mains have further suffered and/or will suffer irreparable harm for which money damages cannot compensate them, such that preliminary and permanent injunctive relief are appropriate.

## **REQUEST FOR RELIEF**

WHEREFORE, the Mains respectfully request that this Honorable Court:

(1) Enter a judgment declaring that WBC § 26-3.1.21 and § 26-5.4 are unconstitutional and violate the Due Process Clause as applied to the Mains and the Property;

(2) Enjoin the Township, its employees, officers, and agents, from enforcing WBC § 26-3.1.21 and § 26-5.4 against the Mains and in relation to the Property permanently and preliminarily while this litigation is pending;

(3) Award the Mains monetary damages in an amount to be proven at trial;

(4) Award the Mains their reasonable costs, including attorneys' fees, incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

(5) Grant such other and further relief as this Court deems just and proper.

**COUNT IV – PROCEDURAL DUE PROCESS**
**(42 U.S.C. § 1983) (*Plaintiffs Andrew Main and Natalie Main*)**

280. Plaintiffs incorporate in full herein the preceding paragraphs of this Complaint.

281. A procedural due process violation occurs when the government unlawfully interferes with protected property or liberty interests, without providing adequate procedural safeguards.

282. Procedural due process requires that a party be provided notice and an opportunity to be heard by an impartial decision maker at a meaningful time and in a meaningful manner.

283. Subsection 2 of the WBC's "How to Use this Ordinance" section instructs: "The use of the word <u>shall</u> carries significant meaning. <u>Shall</u> regulations must be followed. Requirements that use the word <u>may</u> are discretionary, meaning that the requirement is at the discretion of the Planning Commission, Township Board or Zoning Board of Appeals."

284. WBC § 26-5.1.1.A states, in relevant part, that "[a]ccessory buildings or structures are permitted in the R-10, R-12.5, R-15, and RM districts subject to the limitations specified for each district except as provided for in this section."

285. WBC § 26-5.1.5.D states that "[d]ecorative and privacy fences shall be permitted accessory to a one-family dwelling," and imposes the following requirements:

50

a. The use of woven wire, razor, barbed wire, electrified fences, spikes, and similar materials on any fence shall be prohibited.

b. It shall be unlawful to erect a fence consisting of tires, vehicle parts, pallets, trash or any material capable of providing habitat for pests or vermin.

c. Where one side of a fence has more finished or decorative appearance than the other, the side with the more finished or decorative appearance shall face the road or adjacent lots.

d. Fence height shall be measured from the natural grade adjacent to the highest point of the fence.

WBC § 26-5.1.5.D.i.

286. In addition, for non-lakefront properties, fences must be constructed within a rear yard or side yard, and may not be taller than six feet. WBC § 26-5.1.5.D.ii.a-b.

287. The Property is zoned as R-15 and is non-lakefront, and is subject to WBC § 26-5.1.1.A and § 5.1.5.D.

288. Because WBC § 26-5.1.5.D states that a fence "shall" be permitted, it represents an exception to the "limitations specified" for the Property, such as the woodland and environmental features limitations.

289. WBC § 26-5.1.5.D states that a fence "shall" be permitted, such that the Township does not have the discretion to deny permission to install a fence on a Property when the proposed fence complies all of the mandatory, minimum requirements contained in WBC § 26-5.1.5.D.

290. The Mains first submitted their fence permit application in June 2024.

291. The fence the Mains sought to install via their fence permit application complies with all the mandatory, minimum requirements contained in WBC § 26-5.1.5.D.

292. Therefore, the Mains have a legitimate claim of entitlement or justifiable expectation that the Township would process and approve their fence permit application.

293. As such, the Mains have a vested property interest in being permitted to install a fence on the Property, and the Mains' vested property interest is protected by the Due Process Clause.

294. The Mains have been deprived by the Township of their vested property interest by the Township's continued refusal to process the fence permit application and imposition of arbitrary and capricious "requirements" prior to permitting any fence to be installed.

295. The Mains have not had the opportunity to challenge the Township's decision depriving the Mains of their property right, and the Township has not afforded the Mains adequate procedural rights prior to depriving the Mains of their constitutionally protected interest.

296. The Township has informed the Mains that a fence is "never going to happen," and has imposed arbitrary and capricious permit "requirements," such that

submitting any further permit applications would be futile, with no likelihood of success.

297. The Township's actions were taken under color of state law, and pursuant to a policy or custom.

298. The Township's actions have violated the Mains' constitutional rights in violation of the Fourteenth Amendment of the United States Constitution.

## **REQUEST FOR RELIEF**

WHEREFORE, the Mains respectfully request that this Honorable Court:

(1) Enter a judgment awarding the Mains permanent mandatory injunctive relief, requiring the Township to approve the Mains' fence permit application;

(2) Enjoin the Township, its employees, officers, and agents, from enforcing WBC § 26-3.1.21 and § 26-5.4 against the Mains and in relation to the Property permanently and preliminarily while this litigation is pending;

(3) Award the Mains monetary damages in an amount to be proven at trial;

(4) Award the Mains their reasonable costs, including attorneys' fees, incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

(5) Grant such other and further relief as this Court deems just and proper.

## COUNT V – VIOLATION OF MICHIGAN ZONING ENABLING ACT
### (MCL 125.3504) (*Plaintiffs Andrew Main and Natalie Main*)

299. Plaintiffs incorporate in full herein the preceding paragraphs of this Complaint.

300. Under Michigan's Zoning Enabling Act, MCL 125.3101 *et seq.*, local units of government are authorized to enact zoning ordinances "to promote public health, safety, and welfare."

301. MCL 125.3504 requires that when a zoning ordinance "provides for discretionary decisions, the regulations and standards upon which those decisions are made shall be specified in the zoning ordinance."

302. The Township's zoning ordinances are contained in WBC § 26.

303. WBC § 26-3.1.21 and § 26-5.4 do not contain regulations or standards for the discretionary decisions related to the permits the Township is requiring from the Mains and, as such, do not satisfy MCL 125.2504.

304. Therefore, the Township has exceeded its authority under Michigan's Zoning Enabling Act, which renders the EFS Ordinance and the Woodlands Ordinance void.

305. In addition, to the extent there are any other regulations or standards the Township is applying to the Mains' permit applications which are not contained in WBC § 26, such regulations or standards exceed the Township's authority under Michigan's Zoning Enabling Act and are therefore void.

54

**REQUEST FOR RELIEF**

WHEREFORE, the Mains respectfully request that this Honorable Court:

(1) Enter a judgment declaring that certain portions of WBC § 26 are void;

(2) Enjoin the Township, its employees, officers, and agents, from enforcing the void portions of WBC § 26 against the Mains and in relation to the Property permanently and preliminarily while this litigation is pending;

(3) Enjoin the Township, its employees, officers, and agents, from enforcing any regulations or standards against the Mains and in relation to the Property permanently and preliminarily while this litigation is pending; and

(4) Grant such other and further relief as this Court deems just and proper.

**COUNT VI – FAIR HOUSING ACT**
**(42 U.S.C. § 3604(f)(1), (f)(2), (f)(3)(A) and (f)(3)B)) (*All Plaintiffs*)**

306.   Plaintiffs incorporate in full herein the preceding paragraphs of this Complaint.

307.   The Fair Housing Act, 42 U.S.C. § 3601 *et seq*., extends the guarantee of fair housing to individuals with disabilities.

308.   Plaintiff A.M. is a person with a handicap under the Fair Housing Act, 42 U.S.C. § 3602(d) and (h), and has suffered damages and loss of civil rights as a result of the Township's discriminatory conduct.

309.   In addition, Plaintiffs Natalie and Andrew have suffered and continue to suffer economic loss due to the Township's discriminatory conduct.

55

310.   The Plaintiffs' planned modification and use of the Property constitutes a "dwelling" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b).

311.   The Township violated Plaintiffs' rights under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, by:

    a.  Enforcing the Township's Zoning Ordinance and permit procedures in a manner that has a disparate impact on Plaintiffs;

    b.  Failing to allow the Plaintiffs to make a reasonable and necessary modification to their property that would afford them an equal opportunity to use and enjoy the property.

    c.  Failing to make a reasonable and necessary accommodation to afford the Plaintiffs an equal opportunity to use and enjoy the Property.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(1) A declaration that the Township's practice and policy of denying Plaintiffs a reasonable modification to their property to accommodate A.M.'s special needs relating to his disability, is discriminatory and illegal as violating the Fair Housing Act;

(2) A declaration that the Township's actions in denying the Plaintiffs a reasonable accommodation is illegal as violating the Fair Housing Act;

56

(3) That Plaintiffs have and recover compensatory damages in an amount to be determined at trial, together with any special damages arising out of the Township's conduct as described in this Complaint;

(4) That Plaintiffs have and recover nominal damages;

(5) That Plaintiffs have and recover attorney fees and costs as provided by federal statute; and

(6) Such other and further relief as this Court may deem just and appropriate.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Respectfully submitted,

*/s/ Kathryn E. Gasior*
Mary A. Mahoney (P41568)
Kathryn E. Gasior (P87347)
BROWN BORKOWSKI & MORROW
37887 West Twelve Mile Road
Farmington Hills, MI 48331
(248) 987-4040
mmahoney@bbmlawpc.com
kgasior@bbmlawpc.com
*Attorneys for Plaintiffs*

Dated:  May 1, 2026

57